**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| GRAPHIC COMMUNICATIONS NATIONAL PENSION FUND ET AL., | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. 25-3146-BAH |
| PAVSNER PRESS, INC., | * | |
| Defendant. | * | |

* * * * * * * * * * * * * *

## **MEMORANDUM OPINION**

Graphic Communications National Pension Fund, Kurt Freeman, and Jim Kyger[1] (collectively, "the Fund" or "Plaintiffs") brought suit against Pavsner Press, Inc. ("Pavsner" or "Defendant") alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Labor Management Relations Act of 1947 ("LMRA"). ECF 1. Pending before the Court is Plaintiffs' motion for default judgment and supporting memorandum of law.[2] ECF 9. The Court has reviewed the relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, the motion for default judgment is **GRANTED** with respect to Pavsner's liability and Plaintiffs will be directed to file updated calculations of the monetary relief sought as specified in this opinion.

---

[1] Malcolm Pritzger was originally one of the plaintiffs as a trustee of Graphic Communications National Pension Fund, but was replaced by Jim Kyger after Mr. Pritzger passed away in October 2025. *See* ECF 9-1, at 1 n.1.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

# I. BACKGROUND

## A. Procedural History

Plaintiffs filed the complaint on September 23, 2025. ECF 1. The summons to Defendant was returned executed on October 10, 2025, with an answer due on October 31, 2025. ECF 3. Defendants failed to answer or otherwise respond, and Plaintiffs moved for entry of default on December 29, 2025. ECF 5. The Clerk entered default on January 29, 2026, ECF 6, and sent notice of default to Defendant on the same day, ECF 7. The notice of default was returned as undeliverable on February 11, 2026. ECF 8. Plaintiffs moved for default judgment on March 2, 2026. ECF 9.

## B. Factual Allegations

This case concerns Pavsner's alleged failure to contribute to the Fund on behalf of an employee covered under a collective bargaining agreement ("CBA") and its alleged failure to pay withdrawal liability to the Fund in accordance with its contractual and statutory obligations. ECF 1, at 8–10 ¶¶ 30–44. The Fund is an employee benefit plan and multiemployer plan administered in Carol Stream, Illinois, that was "established and maintained for the purpose of providing pension benefits to eligible employees." ECF 1, at 2 ¶ 5. Pavsner is an employer that, at all times relevant to the action, was incorporated in Maryland with its principal place of business in Baltimore, Maryland. *Id.* at 3 ¶ 8.

### 1. Pavsner's Alleged Unpaid Contributions

Plaintiffs allege that at all times relevant to the action, Pavsner employed workers represented for the purposes of collective bargaining by Local 14-M of District Council 9 of the Printing Packaging & Production Workers Union of North America ("Local 14-M"). *Id.* ¶ 9. Pavsner "was signatory to, and bound by, a collective bargaining agreement ('CBA') with Local

14-M," under which it "was obligated to submit remittance reports and fringe benefits contributions to the Fund on behalf of" the covered employees.[3] *Id.* at 4 ¶ 10. Further, by contributing to the Fund, Pavsner was "obligated to abide by the terms and conditions of the Trust Agreement establishing the Fund," also known as the "Trust Document." *Id.* ¶ 11. Pursuant to that Trust Document, payments due to the Fund are calculated based on the remittance reports prepared by each contributing employer. *Id.* ¶ 12. Plaintiffs allege that under ERISA, the LMRA, and the Trust Document, "if Pavsner Press fails to timely submit the contractually required remittance reports and contribution payments, and the Fund files a lawsuit to recover the unpaid contributions, Pavsner Press is required to pay" interest on delinquent contributions, liquidated damages, attorneys' fees and costs. *Id.* ¶ 13.

Plaintiffs allege that for the period of June 2017 to February 2021, Pavsner employed an individual for whom contributions were owed to the Fund. *Id.* at 5 ¶ 14. Despite Pavsner's obligations to contribute to the Fund on behalf of its covered employees, Pavsner failed to do so. *Id.* ¶ 15; *see also* ECF 9-9, at 5 ¶ 22 (declaration from Audrey Chang, the Fund's Controller, explaining that based on the Fund's records, "Pavsner owes contributions but has not made contributions for the period between June 2017 and February 2021 on behalf of Matthew Main, a Fund participant. The total sum of the contributions owed and not paid by Pavsner is $8,359.13").

2. Pavsner's Alleged Withdrawal Liability

In October 2024, the Fund determined that Pavsner had effected "a complete withdrawal from the Fund." ECF 1, at 5 ¶ 17. Specifically, on October 15, 2024, "the Fund's actuary

[3] In a declaration attached to Plaintiffs' motion for default judgment, Plaintiffs note that the CBA expired in 2015, but that "Pavsner continued to abide by its terms with respect to its obligations to the Fund, including but not limited to making contributions on behalf of its covered employees." ECF 9-9, at 5 ¶ 21.

completed a preliminary assessment of Pavsner Press's withdrawal liability . . . in the amount of $36,105,291.47" given the company's alleged complete withdrawal from the Fund. *Id.* ¶ 18. The Fund amortized that amount in accordance with ERISA in a payment schedule comprising "240 quarterly payments of $5,531.31 each, with the first payment being due January 14, 2025." *Id.*

In accordance with its obligations under ERISA, the Fund allegedly notified Pavsner of the preliminary withdrawal liability assessment by sending Pavsner notice via certified mail on October 16, 2024. *Id.* ¶ 19. In that notice, the Fund "noted that the preliminary assessment had been calculated using data as if Pavsner Press had withdrawn in the Plan Year ending April 30, 2024," and "further stated that when more current data became available, the assessment would be adjusted accordingly." *Id.* ¶ 19. On December 6, 2024, the Fund recalculated its preliminary assessment "based on data for a withdrawal occurring in the correct Plan Year (ending April 30, 2025)." *Id.* at 6 ¶ 20. In a new notice, the total assessed withdrawal liability decreased from $36,105,291.47 to $35,421,984.01. *Id.* "However, after applying the 20-year cap, the withdrawal liability assessment remained at $1,327,514.40, and therefore Pavsner Press's resulting payment schedule and 240 monthly payments of $5,531.31 remained unchanged." *Id.*

On January 9, 2025, Pavsner requested a review of the Fund's assessment of its withdrawal liability. *Id.* ¶ 21. On February 13, 2025, the Fund responded to Pavsner's request for review, upholding the Fund's assessment of Pavsner's withdrawal liability. *Id.* ¶ 22. At that point, Pavsner "did not make a demand for arbitration" in accordance with the applicable ERISA provision, and "therefore has waived the right to challenge the withdrawal liability assessment made by the Fund." *Id.* ¶ 23.

Despite Pavsner's obligation to begin making withdrawal liability payments on January 14, 2025, Pavsner failed to make any payments as of the filing of the complaint. *Id.* at 7 ¶ 24. On

March 17, 2025, the Fund notified Pavsner that its withdrawal liability payment was overdue and that the company would be in default if payment were not received by the Fund by May 16, 2025. *Id.* ¶ 25. On April 29, 2025, the Fund sent Pavsner a follow-up demand to cure its default by commencing withdrawal liability payments by May 16, 2025. *Id.* Pavsner allegedly "failed to respond to the Fund's correspondence and did not cure its failure to pay the first payment in accordance with the payment plan." *Id.* ¶ 27. Consequently, Plaintiffs allege, Pavsner "is in default and is liable for the unpaid principal of the withdrawal liability, plus accrued interest on the unpaid amounts owed from the due date of the first owed payment not timely made," in addition to "interest, liquidated damages, and reasonable attorneys' fees and costs in accordance with the Trust Document and applicable federal law." *Id.* at 7–8 ¶ 27–28.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." A court may conduct hearings or make referrals when necessary to determine the damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2). Thereafter, the court may enter default judgment at the plaintiff's request and with notice to the defaulting party. *Id.*

The Fourth Circuit has expressed a "strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010). However, "default judgment may be appropriate when the adversary process has been halted because of an . . . unresponsive party." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). "A defendant's default does

not automatically entitle the plaintiff to the entry of a default judgment; rather, that decision is left to the discretion of the court." *Choice Hotels Int'l, Inc. v. C Kop Hurp, LLC*, Civ. No. DKC-25-2078, 2025 WL 3290665, at *1 (D. Md. Nov. 26, 2025) (citing *Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002)). Further, the "party moving for default judgment must still show that the defaulted party was properly served and that the unchallenged factual allegations constitute a legitimate cause of action." *Harris v. Blue Ridge Health Servs., Inc.*, 388 F. Supp. 3d 633, 638 (M.D.N.C. 2019) (internal citations and quotation marks omitted).

## III. DISCUSSION

### A. Service of Process

"Before a court can render default judgment, it must be satisfied that the defaulting party has been properly served." *Bd. of Trs. Sheet Metal Workers' Nat'l Pension Fund v. Gentlemen Sheet Metal Ltd.*, No. 1:25-CV-803-MSN-WEF, 2025 WL 3200753, at *2 (E.D. Va. Oct. 27, 2025), *report and recommendation adopted*, No. 1:25-CV-803-MSN-WEF, 2025 WL 3197874 (E.D. Va. Nov. 14, 2025). "Absent waiver or consent, a failure to obtain proper service on the defendant deprives the court of personal jurisdiction over the defendant." *Koehler v. Dodwell*, 152 F.3d 304, 306 (4th Cir. 1998) (citing *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984)).

Rule 4(h) of the Federal Rules of Civil Procedure governs service on a corporation within the United States, and permits service "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant." Fed. R. Civ. P. 4(h)(1)(B).

The record indicates that Defendant was properly served. *See* ECF 3 (reflecting that Plaintiffs' process server executed service on Robert F. Miller, the registered agent for Pavsner, on October 10, 2025, at 102 West Pennsylvania Avenue Ste 600, Towson, MD 21204); *see also Trademark Remodeling, Inc. v. Rhines*, 853 F. Supp. 2d 532, 541 (D. Md. 2012) ("Generally, the filing of a 'proper proof of service is *prima facie* evidence of valid service of process.'" (quoting *Ngabo v. Le Pain Quotidien,* Civ. No. DKC-11-0096, 2011 WL 978654, at *2 (D. Md. Mar. 17, 2011)) (internal quotation marks omitted)). While Maryland's Business Entity Search online portal indicates that Pavsner's corporate status was forfeited on October 1, 2025, *see* Maryland Department of Assessments and Taxation, Maryland Business Express, Business Entity Search, https://egov.maryland.gov/BusinessExpress/EntitySearch, "all jurisdictions today, including Maryland, have enacted 'corporate survivor' statute[s], which allow forfeited corporations to continue to exist for limited purposes. Maryland's corporate survivor statute treats a forfeited corporation in the process of 'winding up' as 'alive' for the purposes of being sued to satisfy its debts and liabilities." *Reyes v. Manchester Gardens Condominium*, Civ. No. PX-19-2643, 2020 WL 3791964, at *4 (D. Md. July 7, 2020) (internal citations omitted). "Accordingly, the [Appellate Court of Maryland has] held that 'service may be made in any method which would have been appropriate when the corporation was in existence.'" *Id.* (quoting *Thomas v. Rowhouses, Inc.*, 47 A.3d 625, 632 (Md. App. 2012)). "Like a non-dissolved corporation, service is 'valid and proper' when served upon the registered agent of the forfeited or dissolved corporation or an officer authorized to receive service." *Id.* (quoting *Thomas*, 47 A.3d at 631). Additionally, Pavsner's resident agent Robert F. Miller was served on October 10, 2025, just ten days after Pavsner was filed as forfeited, further rendering service on Pavsner proper. *Thomas*, 47 A.3d at 630 (explaining that a forfeited corporation's "'winding up' also generally includes paying

all debts, obligations and liabilities of the corporation, distributing property and resolving pending suits against the corporation"); *see also J & J Sports Prods., Inc. v. Royster*, Civ. No. RWT-10-569, 2010 WL 1741354, at *3 (D. Md. Apr. 28, 2010) (noting that "delivering a copy of a summons and complaint to a registered agent of a forfeited limited liability company less than one year after the forfeiture is effective service on that limited liability company").

**B. Appropriateness of Default Judgment**

"Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails 'to plead or otherwise defend' in accordance with the Rules." *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982) (quoting Fed. R. Civ. P. 55(a)). In *Lawbaugh*, the district court held that default judgment was "clearly appropriate" when the defendant had been unresponsive for more than a year following denial of a motion to dismiss and the motion for default judgment had been duly served upon the Defendant giving "ample notice of impending judgment by default."[4] 359 F. Supp. 2d at 422; *see also United States v. Wright*, Civ. No. TDC-24-0026, 2024 WL 5181775, at *2 (D. Md. Dec. 20, 2024) (recommending granting plaintiff's motion for default judgment where defendant "neither filed an [a]nswer or otherwise defended against the [c]omplaint" ten months after being properly served), *report and recommendation adopted*, Civ. No. TDC-24-0026, 2025 WL 944455 (D. Md. Jan. 13, 2025). Likewise, in this case, over a year has passed since Defendant was served with process on October 10, 2025. *See* ECF 3. In that time, Defendant has never answered, entered an appearance, or otherwise responded to the

[4] In this case, the order of default, ECF 6, and notice of default, ECF 7, mailed to Pavsner were returned as undeliverable on February 11, 2026. ECF 8. However, Plaintiffs complied with Loc. R. 108.2 (D. Md. 2025) by including the last known addresses of the defendants in its request for entry of default. ECF 5, at 2; *see also Wells Fargo Bank, N.A. v. Gateway Int'l Logistic, Inc.*, Civ. No. JRR-22-2487, 2023 WL 2473255, at *1 n.3 (D. Md. Mar. 13, 2023) (noting Clerk's notice of default was returned as undeliverable but Plaintiffs "provided Defendant's last known address, as required under Loc. R. 108.2" in its request for entry of default).

complaint. *See* ECF 9, at 2 ¶ 3 (noting that "Defendant has failed to appear or file an answer or other responsive pleading"). Default judgment is thus appropriate.

**C. Liability**

When considering a motion for default judgment, the Court takes as true all well-pleaded facts in the complaint other than those related to damages. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). In exercising this task, the Court applies the pleading standards announced in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in the context of default judgments. *See, e.g.*, *Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011). A complaint that avers bare legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement,'" is insufficient to award default judgment. *Id.* (brackets in original) (quoting *Iqbal*, 556 U.S. at 678). The Court "must, therefore, determine whether the well-pleaded allegations in [the] complaint support the relief sought." *Ryan*, 253 F.3d at 780. The complaint brings two counts, which the Court considers in turn, before considering any reasonable attorneys' fees and costs.

1. Unpaid Contributions (Count I)

The Fund brings Count I under 29 U.S.C. §§ 1132(a)(3) and 1145, and 29 U.S.C. § 185, alleging that Paysner failed to make contributions to the Fund for a covered employee from the months of June 2017 to February 2021. ECF 1, at 8 ¶¶ 31–32.

"When an employer executes a CBA with a local union governing the terms of employment, the CBA will often require the employer to contribute to" multiemployer pension plans like the Fund. *Bd. of Trs., Shet Metal Workers' Nat. Pension Fund v. Four-C-Aire, Inc.*, 929

F.3d 135, 138 (4th Cir. 2019). When Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("the MPPAA"), it "placed multiemployer plans in a stronger position to collect outstanding contributions 'than they [would] otherwise occupy under common law contract principles.'" *Id.* at 139 (quoting *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). Specifically, under 29 U.S.C. § 1145, the "MPPAA provides a separate federal cause of action permitting multiemployer plans to collect contributions from employers so long as the plan is able to establish an obligation to contribute under the terms of the plan's governing documents or the CBA." *Id.* In such a scenario, "even if an employer could assert a valid common law defense, it must give way to the plain language of the CBA or governing plan documents." *Id.* at 140. Further, ERISA provides that in any action to enforce 29 U.S.C. § 1145, the court shall award the plan unpaid contributions, interest on the unpaid contributions, an amount equal to the greater of interest on the unpaid contributions or liquidated damages provided for under the plan but not in excess of twenty percent, and reasonable attorneys' fees and costs. 29 U.S.C. § 1132.

The Fund alleges that Pavsner is obligated under the terms of the CBA to "provide contributions to the Fund on behalf of its covered employees" but "has failed and refused to fulfill its contractual obligations for the months of June 2017 through February 2021 for owed contributions." ECF 1, at 8 ¶ 32. While the Fund acknowledges that the CBA expired in 2015, it alleges that "Pavsner continued to abide by its terms with respect to its obligations to the Fund, including but not limited to making contributions on behalf of its covered employees." ECF 9-9, at 5 ¶ 21. And indeed, the Fourth Circuit has held "that a collective bargaining agreement can be adopted by conduct manifesting an intention to be bound by its terms." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 448 (4th Cir. 2015) (finding

a company's "inten[t] to be bound [by a CBA was] also made unmistakably clear by the fact that [the company] made contributions to the Fund in accordance with the governing collective bargaining agreements for thirteen years before its complete withdrawal"). In its motion for default judgment, Plaintiffs have also provided a copy of the CBA, which states that the "company shall make contributions to [the Fund] for the benefit of its employees in the amount of 6%." ECF 9-9, at 23. In other words, through both its pleadings and the declaration attached to its motion for default judgment, the Fund has adequately pled that Pavsner was bound by a CBA that required it to contribute to the Fund on behalf of covered employees but that it did not do so for one employee from June 2017 to February 2021, resulting in unpaid contributions for which Pavsner is liable.[5]

The Fund alleges, both in its complaint, ECF 1, at 5 ¶ 14, and in a declaration submitted by the Fund's Controller, Audrey Chang, ECF 9-9, at 5 ¶ 22, that based on remittance reports prepared and submitted to the Fund by Pavsner, Defendant owes contributions for the months of June 2017 through February 2021 in the amount of $8,359.13. However, the declaration does not appear to provide any underlying data on which it relied to come to this calculation, *see id.*, and it features a slight discrepancy from the alleged delinquent contribution liability of $8,678.97 provided in an attachment to the motion, *see* ECF 9-7, at 2. Further, under the Trust Agreement, to which Pavsner is bound via the CBA, the Fund alleges that Pavsner owes liquidated damages

[5] Plaintiffs also provide prior correspondence between Plaintiffs' counsel and the President of Pavsner stating that the Fund wrote to Pavsner on December 6, 2024, regarding delinquent contributions owed on behalf of Mathew Main and "requested an estimated payment of $21,326.22" comprising delinquent contributions, interest, and liquidated damages. ECF 9-7, at 2. The correspondence further states that Pavsner responded via counsel "conceding that delinquent contributions were owed, providing additional records, disputing the amount of delinquent contributions as $8,075.08, and requesting that the Fund waive liquidated damages and interest." *Id.* The correspondence then states that the Fund reviewed Pavsner's response and "adjust[ed] the delinquent contributions owed to $8,678.97 based on the additional records . . . [and] also adjusted the interest ($3,807.86) and liquidated damages ($1,671.83) . . . but declined the request to waive those charges." *Id.*

totaling twenty percent of its delinquent contributions, or $1,671.83. ECF 9-9, at 5 ¶ 23; *see also* ECF 9-9, at 47–48 (Trust Agreement specifying employer's liability for twenty percent of unpaid contributions as liquidated damages). Finally, per the Trust Agreement, the Fund alleges that Pavsner owes $4,636.80 in interest calculated through February 28, 2026. ECF 9-9, at 5–6 ¶ 24. However, Ms. Chang's declaration states that the interest rate on unpaid contributions is calculated "at greater the rate of prime plus one percent or *eight-and-a-half percent*," *id.* (emphasis added), while the Trust Agreement itself states that the interest rate is prime plus one percent or *eight* percent, *see id.* at 47–48 (Trust Agreement specifying interest rate on unpaid contributions as the prime rate plus one percent or eight percent, whichever is greater). Consequently, though the Court will grant default judgment with respect to liability on Count I, given the Court's uncertainty regarding the basis for the principal liability calculation and the apparent discrepancy in applicable interest rates, the Court will order the Fund to file an updated calculation of all monetary relief it seeks, and to clarify its method for calculating each amount, including the principal liability, interest, and liquidated damages, along with supporting documentation, current through the date of the Fund's response.

2. Unpaid Withdrawal Liability (Count II)

In Count II, Plaintiffs allege that Defendant has violated various provisions of ERISA and the LMRA by "fail[ing] to pay amounts owed for withdrawal liability for a period greater than sixty (60) days after notification of failure by the Fund" and consequently going into default." ECF 1, at 9 ¶¶ 38–39. Plaintiffs allege that Defendant is liable for the "full principal amount of the withdrawal liability assessment, limited by the 20-year cap . . . in the amount of $1,327,514.40." *Id.* ¶ 40. Plaintiffs also seek accruing interest on all late payments, liquidated damages in the amount of twenty percent of the delinquent withdrawal liability according to the

Trust Document and federal law, and reasonable costs and attorneys' fees. *Id.* at 10 ¶¶ 41–43. The Court considers each form of relief sought.

*i. Principal Withdrawal Liability*

Congress enacted ERISA in 1974 to "assure private-sector workers that they would receive the pensions that their employers had promised them." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995) (reviewing ERISA's requirement that employers "make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities" among other provisions). However, in its original form, "ERISA did not adequately protect multiemployer pension plans from the adverse consequences of individual employers terminating their participation in such plans and leaving behind unfunded vested benefits." *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006). The resulting "scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417. Given the incentive for employers to withdraw and lack of protections against such withdrawals, "a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Id.*

In response, Congress passed MPPAA in 1980 to address ERISA's shortcomings. MPPAA "transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty" by "impos[ing] a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent)." *Id.* "In brief, [the MPPAA] sets the total amount of withdrawal liability at a level that roughly matches the employer's proportionate share of the plan's unfunded vested benefits." *Bay Area Laundry & Dry*

*Cleaning Pension Tr. Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 197 (1997) (internal quotations omitted); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Lettermen Signage, Inc.*, Civ. No. JKB-23-1059, 2024 WL 2882178, at *2 (D. Md. June 7, 2024) (defining withdrawal liability as an employer's "share of a plan's unfunded and vested benefits").

"An employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan." *Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Srvs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (citing 29 U.S.C. § 1381(a)). "Once the plan sponsors determine that an employer has completely or partially withdrawn from a pension plan, they must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 118 n.4 (4th Cir. 1991) (citing 29 U.S.C. §§ 1382, 1399(b)(1)). "Within 90 days after receiving notice, the employer may ask the plan sponsors to review any specific matter relating to the determination of liability and the schedule of payments." *Id.* (citing 29 U.S.C. § 1399(b)(2)(A)). "'After a reasonable review of any matter raised,'" the plan sponsor must notify the employer of (1) its decision, (2) the basis for its decision, and (3) 'the reason for any change in the determination of the employer's liability or schedule of liability payments.'" *Plumbing Srvs., Inc.*, 791 F.3d at 440 (quoting 29 U.S.C. § 1399(b)(2)(B)). "An employer dissatisfied with the plan sponsor's response must demand arbitration within a 60-day period after the earlier of the date of the plan sponsor's notification that it has rejected the employer's request for review, or 120 days after the employer's request for review." *Id.* (quoting 29 U.S.C. § 1401(a)). "If, however, the employer does not pursue arbitration, the amount assessed by the plan sponsor as withdrawal liability 'shall be due and owing on the schedule set forth by the plan sponsor,' which may then 'bring an action in a State or Federal court of competent jurisdiction for collection.'" *Id.* (quoting

29 U.S.C. § 1401(b)(1)). An employer is in default of required payments when it fails "to make, when due, any payment under [29 U.S.C. § 1399], if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and . . . any other even defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(A–B). "In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.* at § 1399(c)(5). Under 29 C.F.R. § 4219.32(b), interest on overdue withdrawal liability payments is "charged or credited for each calendar quarter at an annual rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day (or next business day if the fifteenth day is not a business day) of the month preceding the beginning of each calendar quarter, as reported by the Board of Governors of the Federal Reserve."

Here, Plaintiffs have adequately alleged Pavsner is liable for unpaid withdrawal liability and resulting interest. Plaintiffs allege that the Fund preliminarily determined that Pavsner had effected a complete withdrawal from the Fund in October 2024. ECF 1, at 5 ¶ 17. The Fund notified Pavsner of its assessment on October 16, 2024, via certified mail. *Id.* ¶ 19; *see also* ECF 9-4 (the Fund's October 16, 2024, letter). On December 6, 2024, the Fund notified Pavsner that it had reviewed and recalculated Pavsner's withdrawal liability based on data for a withdrawal occurring in the correct Plan Year and stated that, under ERISA's 20-year cap, Pavsner's total withdrawal liability assessment was $1,327,514.40, which would be due in 240 monthly payments of $5,531.31. ECF 1, at 6 ¶ 20; *see also* ECF 9-6, at 8 (the Fund's December 6, 2024, letter). On January 9, 2025, Pavsner timely requested review of the Fund's withdrawal liability assessment.

ECF 1, at 6 ¶ 21; *see also* ECF 9-5 (Pavsner's January 9, 2025, request for review). On February 13, 2025, the Fund responded to the request for review and upheld its assessment of withdrawal liability. ECF 1, at 6 ¶ 22; *see also* ECF 9-6, at 3 (the Fund's response to Pavsner's request for review). However, at that point, Pavsner allegedly did not make a demand for arbitration, ECF 1, at 6 ¶ 23, resulting in "the amount assessed by the plan sponsor as withdrawal liability" becoming due on the schedule set forth by the plan sponsor. *See Plumbing Srvs., Inc.*, 791 F.3d at 440.

On March 17, 2025, the Fund notified Pavsner that its withdrawal liability payment was overdue and that the company would be in default if Pavsner did not cure its default and make the required payment by May 16, 2025. ECF 1, at 7 ¶ 25; *see also* ECF 9-6, at 2 (the Fund's March 17, 2025, letter). Then, on April 29, 2025, the Fund sent Pavsner a follow-up demand to cure its default by commencing withdrawal liability payments by May 16, 2025. ECF 1, at 7 ¶ 25; *see also* ECF 9-7 (the Fund's April 29, 2025, letter). The Fund alleges that Pavsner never responded to the Fund's correspondence and "did not cure its failure to pay the first payment in accordance with the payment plan." ECF 1, at 7 ¶ 27.

In summary, the Fund has adequately alleged that it assessed withdrawal liability upon Pavsner; Pavsner timely requested review of that assessment; the Fund denied the request for review; Pavsner failed to demand arbitration, resulting in the assessed liability becoming due and owing according to the Fund's provided schedule; and Pavsner defaulted on those due payments and failed to cure its default, resulting in Pavsner's liability for the total assessed amount of $1,327,514.40 plus interest from the due date of the first payment that was not timely made.

*ii. Liquidated Damages and Interest*

ERISA provides that "[i]n any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within

the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." 29 U.S.C. § 1451(b). Section 1145, in turn, is enforced through 29 U.S.C. § 1132(g)(2), which provides that in any action seeking to enforce 29 U.S.C. § 1145, "the court shall award the plan" the unpaid contribution, interest on the unpaid contribution, the greater of interest on the unpaid contributions or liquidated damages provided for under the plan in an amount not to exceed twenty percent of the unpaid contribution, and reasonable attorneys' fees and costs. The same section provides that "interest on unpaid contributions shall be determined by using the rate provided under the plan." 29 U.S.C. § 1132(g).

Once again, the Fund's Trust Document provides that "[i]nterest shall be calculated at the rate of prime plus one percent, whichever is greater (the prime rate being determined by the rate posted by Morgan Guaranty Trust on the 15th of that month, as published in the *Wall Street Journal*) or eight percent (8%)." ECF 9-9, at 47. Similarly, the Trust Document provides that "[l]iquidated damages shall be calculated as 20 percent (20%) of unpaid Contributions or other payments due, unless a higher percentage is permitted under federal, or state law, in which case, such higher percentage shall apply." *Id.* As stated in Ms. Chang's declaration, the Fund calculated that the interest owed as calculated through February 28, 2026, is $93,801.80. ECF 9-9, at 4 ¶ 16. However, once again, Ms. Chang's declaration states that the applicable interest rate is "a rate of prime plus one percent or eight-and-a-half percent (8.5%), whichever is greater," *id.*, while the Trust Document provides for the prime rate plus one percent or *eight* percent, *see* ECF 9-9, at 47. Finally, Ms. Chang also calculated liquidated damages in the amount of $265,502.88. *Id.* ¶ 17.

Taken together, the total amount of unpaid withdrawal liability, interest, and liquidated damages is $1,686,819.08. However, as above, given the apparent discrepancy in applicable interest rates, while the Court will grant default judgment as to liability on Count II, the Court will

direct Plaintiffs to submit updated calculations of interest and liquidated damages, to clarify its method for calculating each amount, and to file any relevant supporting documentation, current through the date of the Fund's response.

3. Attorneys' Fees and Costs

To determine whether proposed attorneys' fees are reasonable, "the court starts with the 'lodestar' figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 787 (D. Md. 2000) (citations omitted). The Court "appl[ies] the *Johnson/Barber* factors when making its lodestar determination." *Grissom v. Mills Corp.*, 549 F.3d 313, 320–21 (4th Cir. 2008) (citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978)). "An hourly rate is reasonable if it is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 412 (D. Md. 2014) (quoting *Blum v. Stenson*, 465 U.S. 886, 890 n.11 (1984)). The rates outlined in Appendix B to this Court's Local Rules provide that a slightly modified Fitzpatrick Matrix may be a useful guideline for determining reasonable hourly rates.[6] *See De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753–54 (4th Cir. 2025) (providing that "fee matrices can be 'a useful starting point to determine fees'" but that a court "may not elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer" (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)). Other "[e]vidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate." *CoStar Grp., Inc.*, 106 F. Supp. 2d at 788.

[6] The Fitzpatrick Matrix is available at https://perma.cc/T6FC-G4CC.

The Fund filed a declaration from Lauren McDermott ("McDermott"), a partner of the firm Mooney, Green, Saindon, Murphy & Welch, P.C. ("Mooney Green") in her fifteenth year of practice. ECF 9-10, at 1 ¶ 2. McDermott declares that she was assisted in the case by Elizabeth Saindon and Lori Waichman, both partners with Mooney Green, Jason Arendt, an associate with Mooney Green, Zachary Isenhour, a former Mooney Green associate, and Caitlin Cooper, a paralegal with Mooney Green. *Id.* McDermott's declaration states that the Mooney Green legal team spent 53.7 hours of counsel time billed at an hourly rate of $350.00 per hour for partners and $250.00 per hour for associates, and 6.4 hours of paralegal time billed at an hourly rate of $200.00 per hour. *Id.* at 2 ¶ 5. Under *Plyer v. Evatt*, "the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." 902 F.2d 273, 277 (4th Cir. 1990) (internal citations omitted). The Fund has done so. For example, McDermott's declaration includes an attachment containing a summary of the legal services rendered in connection with the case, the date on which those services were rendered, the individual who completed the work, and the time spent completing the work. *Id.* ¶ 8; *see also id.* at 4 (catalogue of legal services rendered). McDermott further attests that the "hourly rates charged by counsel and the paralegal are consistent with the prevailing market rates of counsel and paralegals in the District of Maryland of similar skill for ERISA cases." *Id.* at 2 ¶ 9 (citing *Trs. of the Iron Workers Loc. Union No. 5 v. Miracle Steel, Inc.*, Civ. No. PX-24-2089, 2025 WL 2084988 (D. Md. July 24, 2025); *Int'l Painters v. Fla. Glass of Tampa Bay, Inc.*, Civ. No. SAG-23-45, 2025 WL 712965 (D. Md. Mar. 5, 2025); *Nat'l Elec. Ben. Fund v. NRG Mgmt. Sols.*, 2019 U.S. Dist. LEXIS 178720 (D. Md. Oct. 15, 2019)). The proposed rates are also below those described in the Fitpatrick Matrix, which this District considers "a useful guideline for hourly rates . . . with a reduction of 5% to 20%" to reflect differences between legal markets in

Washington, D.C., and Maryland. *See* Loc. R. App'x B (D. Md. 2025). Finally, McDermott attests that in addition to attorneys' fees, Plaintiffs incurred filing fees of $405.00 and $175.08 in process server fees. ECF 9-10, at 2 ¶ 7. Consequently, the Court will order reasonable attorneys' fees and costs of $11,930.08. However, given that clarifying the apparent discrepancy between the applicable interest rate in the Trust Agreement and as stated in Ms. Chang's declaration will require additional time from Plaintiffs' legal team, and the confusion is seemingly due to Plaintiffs' failure to clarify the basis for the calculations, Plaintiffs' counsel will not be awarded additional fees for the time it takes to respond to this Order.

## IV. CONCLUSION

In light of the foregoing, Plaintiffs' motion for default judgment, ECF 9, is **GRANTED** as to Pavsner's liability only. A separate implementing order will issue with additional instructions regarding the appropriate calculation of damages.

Dated: October 28, 2026

/s/
Brendan A. Hurson
United States District Judge